*In re: M.*
No. 807, Sept. Term, 2020
Opinion by Leahy, J.

**Family Law > Children in Need of Assistance > Permanency Plan**

We discern no error or abuse of discretion in the juvenile court's decision to grant custody and guardianship of M. to L.A., her mother's maternal cousin. Consistent with its statutory obligations, the juvenile court focused its determination on M.'s best interests. The court's detailed factual findings reflect appropriate consideration of "[a]ll factors necessary to determine the best interests of the child," as required by CJP § 3-819.2(f)(1)(ii), and FL § 5-525(f)(1).

**Family Law > Children in Need of Assistance > Permanency Plan**

We conclude that the juvenile court did not abuse its discretion in deciding that, after more than six years, Father had yet to make enough progress that reunification was foreseeable and that prolonging the lack of permanency would be detrimental to M.

**Family Law > Children in Need of Assistance > Permanency Plan**

The juvenile court made clear that Father is not an unfit parent, that he sincerely desired to reunite with M., and that he made efforts and progress toward that goal. But the court also concluded that his parental priority and preferences were outweighed by the overwhelming evidence that for over six years he was unable to parent M. consistently or safely, and that remaining with L.A., while continuing visits with Father as she has throughout her life, was in the best interests of M.

Circuit Court for Baltimore City
Case No. 814156002

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 807

September Term, 2020

_____

IN RE: M.

_____

Berger,
Leahy,
Eyler, James R.
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Leahy, J.

_____

Filed:  June 30, 2021

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

When M.[1] was three-years old, the Circuit Court for Baltimore City, sitting as a juvenile court, declared her to be a child in need of assistance ("CINA") due to neglect,[2] removed her from her parents' custody, and authorized relative placement with L.A. M. had already been living with L.A., her mother's maternal cousin, under an informal agreement since she was five months old.

For six years following the CINA adjudication, during which M.'s mother was largely absent, the Baltimore City Department of Social Services ("the Department" or "BCDSS") attempted to reunify M. with appellant, her father ("Father"). Obstacles and setbacks to reunification included Father's multiple incarcerations, living situations, and failure to care for M. during unsupervised visitations in a safe manner. In October 2019, after a series of incidents while in Father's care, eight-year-old M. wrote that she wished she "was dead." After temporarily suspending all visitation, the juvenile court ordered that family therapy and supervised visitation could resume, but that M. could decide whether to attend each visit.

By the time the COVID-19 pandemic was declared in March 2020,[3] M. had not had recent contact with her mother, whose whereabouts are unknown; and she only had limited,

---

[1] To protect the child's identity, we refer only to the first initial in her surname.

[2] *See* Maryland Code (1973, 2020 Repl. Vol.), Courts & Judicial Proceedings Article, § 3-801(f), (g) (defining CINA as a "child who requires court intervention because: (1) The child has been abused, has been neglected,. . . ; and (2) The child's parents, guardian, or custodian are unable or unwilling to give proper care and attention to the child and the child's needs").

[3] *See generally Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020) ("On March 11, 2020, the World Health Organization declared COVID-19 a global pandemic.").

voluntary, and supervised contact with Father. In contrast, her relationship with L.A. had remained one of continuous care and custody, resulting in what M., her therapist, and the juvenile court characterized as a strong mother-daughter bond.

Citing the long history of failure in reunifying M. with Father beyond supervised visitation and the unlikelihood that M. could be fully reunified safely within a reasonably foreseeable time, together with evidence that the lack of permanent placement endangers M.'s mental health, the Department, M., and L.A. asked the juvenile court to order custody and guardianship to L.A. and supervised visitation with Father. In October 2020, after an evidentiary hearing, the juvenile court so ordered, and then closed the CINA case.

Father presents two questions for our review, which we have reorganized and recast as one with three subparts:[4]

1. Did the juvenile court err or abuse its discretion by ordering relative custody and guardianship and closing the CINA case?

    a. Did the juvenile court err or abuse its discretion in failing to consider the impact of the pandemic on reunification efforts?

---

[4] In his brief, Father frames the issues as follows:

"1.    Did the juvenile court err when it granted custody and guardianship of the respondent to a third party and closed the CINA matter during the COVID-19 pandemic?

    A.  Did the juvenile court err in failing to reunify the respondent with a parent that who [sic] indicated he was able to have his child in his care?

2.    Did the juvenile court fail to specify necessary factors before granting custody and guardianship to a third party?"

2

b. Did the juvenile court err or abuse its discretion in failing to (1) consider future funding by the Department, and (2) make a finding that there are exceptional circumstances warranting custody and guardianship to L.A.?

c. Did the juvenile court err in failing to consider the priority given to natural parents or by treating the length of these CINA proceedings as the basis for a best interest finding, without determining that Father was "either unfit or that exceptional circumstances exist"?

For the reasons that follow, we hold that the juvenile court did not err or abuse its discretion in ordering custody and guardianship to L.A. or in closing the CINA case. Accordingly, we affirm the judgment.

## BACKGROUND

M. was born in February 2011. M.'s mother has a history of substance abuse, mental health issues, and lack of stable housing. Father also has a history of incarceration and unstable housing, with periods of homelessness and unemployment. When M. was approximately five months old, L.A. was informally given primary responsibility for M.'s care, and M. has consistently been in L.A.'s care ever since.

Given the overarching concern about the length of M.'s CINA commitment as a factor in the juvenile court's grant of custody and guardianship to her relative, we will categorize relevant events in a timeline, corresponding to M.'s age as relevant events occurred.

***Birth to Age 3: Events Leading to the Department's Intervention***

During M.'s first three years, she had little contact with Father because he was incarcerated. For the next three years, M. only saw Mother a few days each month when L.A. had work-related travel.

*April - June 2014.* On April 14, 2014, while L.A. was away on work-related travel, Mother took M. to daycare and was observed to be incapacitated by possible drug use. The Department was contacted. In June 2014, while the Department investigated, Mother threatened to remove M. from L.A.'s care and move her to a homeless shelter. When the Department was informed of Mother's threat, they made a request for shelter care.[5] M. was removed from the home and custody of her parents on June 4, 2014.

***Age 3: Department's Initiation of Shelter Care and CINA Proceedings***

*June 2014.* On June 5, 2014, after investigating reports of neglect and making home visits, the Department petitioned for shelter care for M., alleging that Mother neglected M. and that Father was unable to take steps to protect her from that neglect. Amongst other things, the Department alleged that Mother has a "history of abusing nonprescribed medications"; has engaged in unsuccessful drug treatment; has a history of mental health issues and unstable living arrangements; "has a history of leaving [M.] in the care of others for extended periods without making adequate arrangements"; and "failed to notify the caretaker to inquire about the well-being of [M.]." The Department also alleged that Father

---

[5] The petition was made on June 5, 2014 but noted that M. was "initially removed from the home and custody of the parent(s) and placed in Shelter Care on June 4, 2014."

was "unavailable to protect [M.] at the time" because he was on a home-monitoring device following a 2012 robbery conviction, was unemployed, and was living with his father.

That same day, the court conducted an emergency shelter care hearing. At the hearing, Father was present and represented by counsel.[6] The juvenile court granted the Department's request for shelter care, explaining that "continued residence in the home is contrary to the welfare of the child and it is not now possible to return the child to the home" because of Mother's mental health issues and her issues with homelessness. The court also ordered relative placement with L.A. and supervised visits with Father and Mother, pending an adjudicatory hearing on June 24, 2014.

On June 24, 2014, the adjudicatory hearing was held. The parties failed to reach an agreement concerning the placement of M. The court ordered relative placement with L.A. pending a contested hearing and set that hearing for August 1, 2014.

*July/August 2014.* Father was released from GPS monitoring in July. At the August 1, 2014 hearing, the parties stipulated to six facts, including that Mother has a history of abusing nonprescribed medications and fails to remain drug free (although, at the hearing, Mother contended that the medications were prescribed and that she was drug free at that time); that Mother has a history of mental health issues; that Mother has a history of leaving M. in the care of others for indefinite time periods without making adequate arrangements for her care; and that Father has a history of incarceration and was unavailable to protect M. at the time of her removal from Mother's care.

---

[6] Mother was not present but was represented by a public defender.

5

The court sustained these facts and deferred the disposition hearing to receive additional information and allow Mother to find housing. The court continued the prior shelter care arrangement and ordered shelter care with L.A., while granting supervised visitation to Father. The court also referred Mother to the Family Recovery Program. Finally, the court set a disposition hearing for October 9, 2014.

*October 2014.* The October 9 disposition hearing was postponed, but the court ordered M. to be placed in "shelter care with relative placement" with L.A. As justification, the court again referred to Mother's mental health issues and issues with homelessness. The court also ordered that Father "shall have 3 unsupervised day visits with the respondent and [then] it shall progress to unsupervised overnights."

*November/December 2014.* By December 2014, Father had completed parenting classes, obtained employment, and attended a therapy session with M. He had two overnight visits in November and December and other unsupervised visits. On December 17, however, he was charged with second degree assault and incarcerated.

### Ages 3 to 4: CINA Disposition

*January/February 2015.* In January 2015, Father was still incarcerated, and Mother had tested positive for illegal drugs. The CINA disposition hearing was postponed from January 14, 2015 to February 12, 2015.

At the February 12 disposition hearing, the Department requested that M. be committed to them "for relative placement." On February 24, 2015, the juvenile court issued a written order adjudicating M. a CINA and committing her to the Department for relative placement with L.A. In its order, the court found that M. was placed with L.A. and

6

"has done well with this placement." M. was attending daycare and weekly therapy under L.A.'s care. The court noted that Mother tested positive for illegal drugs in January 2015 and was discharged from her detoxification program for noncompliance. Finally, the court found that, although Father had engaged in parenting classes and taken M. to therapy, he was then incarcerated for violating his probation.

Although Father was incarcerated at the time of the February 12 hearing, he nevertheless participated. Father agreed that continuation of M.'s placement with L.A. was in her best interest. The court then set a ten-month review hearing for April 13, 2015.

### Ages 4 to 9: CINA Review and Permanency Planning Proceedings

*April 2015.* On April 13, 2015, a ten-month review hearing was conducted. Father had just been released from incarceration after second degree assault charges were dismissed. He agreed to continue M.'s placement with L.A. but committed to re-engaging with M.'s therapy. Mother was not cooperating with the Department or visiting M. After consulting with M., the court established a permanency plan of reunification with a parent, with a projected implementation "by 4/13/16." The court then set a six-month review hearing for November 10, 2015.

*November 2015/January 2016.* Father did not attend hearings scheduled on November 10, 2015 and January 28, 2016 but was represented by counsel at both hearings. Father had a conflicting court matter on the January hearing date. The court set the next hearing for March 10, 2016.

*March/April 2016.* At the March 10 review hearing, the court reset the hearing for April 27, 2016 and ordered M.'s therapist to appear. The court further ordered Father's visitation with M. to be supervised until that hearing.

On April 25, 2016, Father was found guilty and sentenced for unlawful possession of a controlled dangerous substance and charged with violation of probation.

*June 2016.* At the June 20, 2016 review hearing, Father again agreed to continue M.'s placement with L.A. He was still resolving criminal issues but anticipated that his violation of probation charge would be dismissed at a July 25, 2016 hearing.

At the June review hearing, the court considered whether to allow unsupervised visits between M. and Father. The Department requested that supervised visits between Father and M. be continued. The court heard testimony from M.'s therapist, Marilyn Yunk. She testified that M.'s anxiety had decreased over the past year. Although she had not observed M. exhibiting any "fear or uneasiness" when interacting with Father, she opined that it would be "premature to consider unsupervised visitation." Ms. Yunk explained that Father is "often [] incarcerated" and that the time to consider unsupervised visitation might be when "down the road he's moved beyond that behavior[.]" When questioned, she elaborated on her concern by recounting an occasion on which M. told her that the police were chasing M. and Father. Ms. Yunk conceded during cross-examination that it is possible the incident M. described could have been a dream.

The Department case worker who supervised visitation likewise advised against "premature" unsupervised visitation with Father. The Department also revealed that another case worker had raised concerns about Father being "under the influence" when

8

visiting with M. Although Father reported he had housing, the case worker had been unable to complete a home inspection of the alleged residence. Father was not on the lease and according to his "significant other," he was not living at the residence "on a regular basis."

In its June 28, 2016 written order, the court acknowledged that the parties stipulated and agreed that M. remained a CINA and that it was in her best interests to continue relative placement with L.A. The court also continued supervised visitation for Father, reiterated the permanency plan of reunification with a parent or guardian, and extended the projected implementation date to March 10, 2017.

*March 2017.* At the March 9, 2017 review hearing, all parties stipulated and agreed that M. was still a CINA. In its written order, dated March 20, 2017, the juvenile court changed the permanency plan from reunification to a plan of reunification concurrent with placement with a relative for custody and guardianship, with projected implementation by March 9, 2018. M., now in kindergarten, had been discharged from therapy and expressed a desire to remain with L.A. The court found that M. "has done well" in her placement with L.A. and was "doing very well in school." Mother had not visited, and her location was unknown. Father had not signed a service agreement or provided a copy of a lease for the residence where he was living, although the Department had found his residence acceptable. Father's visits were still supervised while he was on probation. The Department indicated that "[i]f there is a period of consistent supervised visits in the community with" L.A. and M., then the Department would "expand [F]ather's visit to unsupervised as arranged between [F]ather and [L.A.]." Father remained unemployed despite job referrals by the Department.

9

*May 2017.* In May of 2017, pursuant to Code of Maryland Regulations ("COMAR") 07.01.06.01,[7] the Citizens' Review Board for Children ("CRBC") disputed the reunification permanency plan, on the ground that M. was thriving in the care of L.A. The CRBC pointed out that, although Father presented a plan for M. to reside in the home of his girlfriend, there was "no indication that [the girlfriend] has been involved in any of the planning, nor has the Department explored her suitability as a caregiver for [M.]" Further, the CRBC noted that Father had "no visible means of support nor ha[d] he provided the Department with any documentation of his efforts to become employed."

*December 2017.* On December 4, 2017, a review hearing was conducted. Both Mother and Father were present and represented by counsel. In a written order, the juvenile court granted four hours of unsupervised visitation once a week to Father, finding "no likelihood of further child abuse or neglect[.]" Mother was also granted one and a half hours of supervised visits weekly.

*February 2018.* After a review hearing, the court ordered that "Father is to transition to overnight weekend visitation once his residence clears approval/inspection of BCDSS."

*May 2018.* After a review hearing, Father was granted continued overnight weekend visitation and a week-long summer visit.

*July 2018.* After a review hearing, the court expanded Father's visitation to three and a half days each week.

---

[7] Pursuant to COMAR 07.01.06.01, among other duties, the "Citizens' Review Board for Children . . . [r]eviews cases of children in out-of-home placement to promote their: (1) Safety in out-of-home placement; (2) Placement in a safe, nurturing, and permanent home; and (3) Healthy development."

*August/September/October 2018.* At a review hearing conducted over two dates, the Department recommended changing the permanency plan from a concurrent plan of reunification and relative custody and guardianship to custody and guardianship to relative, citing L.A.'s lifelong care of M. and the undue emotional impact M. would suffer were she removed from L.A. Father requested sole custody.

In a written order, dated October 1, 2018, the magistrate recommended that the permanency plan be changed to custody and guardianship to a relative, with custody and guardianship to be granted to L.A. She also recommended continuing overnight visits for Father on all but one weekend of each month and closing the CINA case.

In support of her recommendations, the magistrate noted that M.'s placement with L.A. was stable and that L.A. had cared for M. for seven years. The magistrate acknowledged that Father had made "progress" in having successful visitation, becoming employed, and completing parenting classes. She noted, however, Father's unstable housing, "extensive contact with the criminal justice system," and his failure to appear for family bonding and parental fitness evaluations scheduled by the Department.

The magistrate also credited testimony by M.'s therapist, Dr. Joan Kaufman, a clinical psychiatrist and professor at The Johns Hopkins University and Director of Research of the Center for Child Abuse and Traumatic Stress at the Kennedy Krieger Institute with extensive expertise in "child and family traumatic stress." "Dr. Kaufman testified that [L.A.] is [M.'s] identified mother" who "has been with [M.] all of her life" and in whose care M. "has thrived[.]" "While [F]ather is committed to her, [M.] would be devastated if separated from" L.A. "Dr. Kauffman also expressed concern about [Father's]

11

ability to put [M.'s] needs first." The magistrate found that "the risk of emotional, developmental and educational harm exists if [M.] is removed from her current placement" with L.A.

On October 4, 2018,[8] Father filed exceptions to the magistrate's recommended October 1, 2018 order and requested a hearing. A series of exception hearings began on January 8, 2019. A subsequent hearing was held on January 16, 2019, after which the court held the decision under consideration pending the Department's completion of a bonding and parental fitness evaluation.

*May 2019.* After a series of postponements, on May 28, 2019, the juvenile court sustained Father's exceptions to the magistrate's recommended October 1, 2018 order. In its May 30, 2019 order, the court changed the permanency plan back to reunification, with no projected implementation date. The court scheduled a review hearing for July 15, 2019.

*June 2019.* L.A. moved to intervene "so that she may participate as a resource for the child . . . and for the purpose of seeking custody or guardianship of" M. L.A.'s motion to intervene was granted.

*October 2019.* On October 10, M. filed an emergency motion to terminate visitation with Father. Following a weekend visit with Father, M. went to school with a note stating that she "wished she was dead" and describing herself as a "B-I-T-C-H like my father said." After a hearing the next day, the court granted the emergency motion, based on the proffer of counsel, and set the matter for an evidentiary hearing on October 21.

---

[8] Father initially filed exceptions on September 27, 2018 but requested that the court disregard these and consider only his October 4, 2018 exceptions.

At the evidentiary hearing, the Department's case worker revealed that in August visits, Father was not present while he was hospitalized for surgery due to a work injury. Without notifying L.A. or the Department, Ms. E., Father's girlfriend, substituted for Father during two of M.'s weekend visits. On one weekend, Ms. E. took M. to work with her at 4 a.m., riding in the truck as Ms. E. drove to make deliveries. Each time Ms. E. left the truck to make a delivery, she told M. to hide under the dashboard. When the Department's caseworker learned about this incident and Father's absence, weekend visits were suspended until September 13, 2019, after Father was released from the hospital.

Then, on the Monday after a weekend visit with Father, M. went to school with a note stating that she "wished she was dead" and "complain[ing] that no one was listening to her." She had a crisis therapy session with Dr. Kaufman that day. M. told her case worker and therapist that during an altercation, Ms. E. had banged M.'s head, and then Father grabbed M. by the shirt collar for being disrespectful.

Dr. Kaufman reported that M.'s relationship with Father had been deteriorating as visitation increased, to the point that M. was reporting that she did "not feel safe." Dr. Kaufman testified that, by August, M. had identified Father, and her desire to live with L.A., as a source of conflict, sadness, and distress. While her relationship with L.A. "continued to be an enormous positive support for" M., her relationship with Father "deteriorated." As forms of punishment, Father placed her in the dark, knowing she fears the dark, and also threatened to hit her with a hanger.

Dr. Kaufman testified that M. was clinically depressed when she was with Father for unsupervised visits "3.5 days per week[.]" In Dr. Kaufman's opinion, M.'s concern

13

about her custody situation elevated her anxiety about being separated from L.A. to a clinical threshold and impacted her at school. Dr. Kaufman testified that M. had "been stating for a very long time . . . where she wants to live and no one's been listening to her. . . . She's feeling very hopeless." If not for M.'s relationship with L.A., Dr. Kaufman would have recommended hospitalization. The juvenile court suspended unsupervised visitation but permitted supervised visits, subject to M.'s consent.

*November/December 2019.* Father began meeting with a family therapist. On December 2, M. agreed to begin participating in family therapy with Father and had more than two dozen sessions.

*February 2020.* The court granted Father supervised visitation, subject to the right of M. to decline on a visit by visit basis. After a review hearing at which L.A. and Father agreed to mediation to improve communication and to a change in the permanency plan, the court revised the plan, from reunification, to a concurrent plan of reunification and placement with a relative for custody and guardianship, with projected implementation by February 5, 2021.

### Age 9: Award of Custody and Guardianship to L.A. and Closure of CINA Case

*September/October 2020.* On September 25, 2020, a contested review hearing was held via Skype due to pandemic-related limitations on in-person court proceedings. Counsel for all parties jointly proffered stipulated facts, including:

1. [M.], age nine continues to be placed with her [mother's] maternal cousin, [L.A.] She is thriving in this placement. [L.A.] wishes to be granted custody of [M.]. [M.] is in the fourth grade . . . . [and] is progressing well in school.

* * * * *

14

5. [Father] has attended family therapy and through his therapy has established appropriate contact with [M.]. He was having in-person contact with [M.] until COVID-19 restrictions occurred. Now [M.] and [Father] have had telephone contact and there were two supervised visits on September 15th and September 20th.

The court received into evidence the Department's guardianship package and a recommendation letter from Dr. Kaufman. The court also heard testimony from Dr. Kaufman and L.A. and interviewed M.

In Dr. Kaufman's letter, she presented her recommendations concerning the custody of M:

1) Another trial not be held to revisit the question of who should attain custody of [M.]; 2) [M.]'s commitment status and the ongoing monitoring of her care by the [Department] be terminated; 3) [L.A.] be granted full physical and legal custody of [M.]; and 4) [Father] be allowed weekly supervised visitation with [M.], with [M.] having the discretion to determine the duration and frequency of the visits, and whether or not they should occur.

In support of her first recommendation, Dr. Kaufman asserted that "[o]ver the past two years, [M] has been consistent in stating to the Judge, the magistrate, her DSS worker, her lawyer, and me that she want[s] to live with [L.A.]" and "stated explicitly that it would scare her to have another trial." In addition to crediting that M. should have her "wishes respected," Dr. Kaufman concluded that the "ongoing custody battle is detrimental to her well-being."

In support of her second recommendation, Dr. Kaufman noted that, although M. had been "a ward of the State for six years," L.A. was "already established as the psychological parent of M. before [the Department] became involved[.]"

[M.] has perceived [L.A.] as her "mother" since she was an infant. The thought that she could be taken from her is devastating. . . . [M.] is also part

15

of a large extended family of cousins, aunts, uncles, and great aunts, and great uncles. When [M.] has a dance performance, there [are] no less than six extended family members to cheer her on. [M.] does not need to be under [the Department's] supervision; she has a loving and caring forever family.

Third, Dr. Kaufman then noted that the Department and M.'s attorney agreed that L.A. should be granted "full physical and legal custody." Finally, Dr. Kaufman recommended that Father "should be a part of [M.]'s life" but determined supervised visitation until communications between Father and M. improved "makes good clinical sense."

At the hearing, Dr. Kaufman elaborated on the recommendations in her letter. She testified that M. required permanency and that six years was "way outside what is considered a reasonable sense of time for a child to have these decisions made[.]" Because L.A. had been M.'s "psychological parent since she was five months old," "[a]ny sense that [L.A.] could be taken away from her causes unnecessary harm, anxiety[.]" While Dr. Kaufman noted that the parties should work for Father to "become an integral part of her life" and she was pleased with the improvement in his relationship with M., "continu[ing] these court hearings [are] unduly stressful, detrimental to her well-being and disrespect[ful] to all of the fundamental principles for trying to make decisions in children's best interest."

With "proper therapeutic work," Father and his significant other could "be an integral part of [M.'s family] that we don't have to worry about [M.]'s safety[.]" Dr. Kaufman testified that the relationship between M. and Father was "moving in a positive direction" but over-stressing it "can lead to failure where there would be another breach of confidence." According to Dr. Kaufman, M. was "explicit that she would not be comfortable even having a day visit without another adult there and she had a look of shock

16

when the idea of a possibility of an overnight visit even was raised. She is absolutely not ready for that." Dr. Kaufman further noted that L.A. "has also always been open to [Father] being a part of [M.'s] life, that's why she bought her a phone so that he can contact her at any time."

After L.A. testified, the court questioned M. The court noted that M. is a "happy, healthy, well-cared for, a very upbeat little girl who wants to please both [L.A.] and her father." The court noted that M.'s demeanor and hesitation "conf[o]rms more closely [to] child's counsel['s] position and the doctor's opinions than of father's proffer[.]" M. stated that, if she did not live with L.A., she would feel "[s]ad."

At the conclusion of the hearing, the court granted custody and guardianship to L.A and approved supervised visitation for Father. After the hearing, the court made detailed factual findings and explained its decision in a written order.

With respect to Father's progress, setbacks, and desire for reunification, the juvenile court determined:

> Father has, over the years since disposition, resolved his criminal matters, obtained stable housing, maintained contact with BCDSS and [M.], progressed at times from supervised visitation only to unsupervised visitation overnight weekend visitation [sic], is presently unemployed and qualified to receive SSI benefits. Unfortunately, on 10/7/2019, [M.] was the victim of abusive corporal punishment by Father's girlfriend (banged [M.'s] head against a wall) and Father. Following that event, [M.] expressed written suicidal ideations at school and disclosed to her therapist, Dr. Kaufman, that she did not feel safe and did not want to return to Father's home.

> Since 10/7/19, and in addition to his other accomplishments listed above, Father has attended more than two dozen family counseling sessions, first alone and then many sessions with [M.] and the family therapist present virtually (not Dr. Kaufman, [M.'s] individual therapist). Father has had two supervised visits with [M.] in September, 2020 – both going well. [M.] is

17

slowly opening to greater contact with her Father according to Dr. Kaufman's expert testimony on 9/25/2020. [L.A.] is supportive of expanding contact between [M.] and Father as therapy progresses to overcome [M.'s] deep fears and anxiety resulting from the 10/7/2019 event and the years of out of home placement as a CINA.

Father seeks continuation of the dual permanency plan of reunification and custody and guardianship to a relative [L.A.]; and ultimately wishes to be reunited with [M.].

The court recognized M.'s bond with L.A., her history of thriving in L.A.'s care, and her hope to remain there.

[M.] has essentially lived her life in [L.A.'s] home (where she has been placed by parents and BCDSS) since she was six [sic] months old. [M.'s] placement with [L.A.] has been briefly interrupted by stays in the home of maternal grandparents with Mother, and Father's home for weekends in 2018 and 2019. [M.] has long considered and referred to [L.A.] as her "mother." [M.] has developed safely and well in [L.A.'s] care; [M.] is very closely attached and bonded to [L.A.] and her large extended family; and [M.'s] educational, medical and avocation interests (e.g. dance) are all well provided for by [L.A.]. [M.] convincingly wishes to remain permanently in [L.A.'s] care and [L.A.] is ready, willing and able to receive and accept custody and guardianship of [M.]. For years, [M.] has consistently expressed to Dr. Kaufman her desire to stay in the home of [L.A.] permanently. Indeed, the convincing expert testimony of Dr. Kaufman reveals that [M.] would suffer serious emotional injury if she were removed from the care of the only fictive-kin "mother" she has ever known (maternal cousin [L.A.]). Dr. Kaufman also opines that the continuation of these CINA proceedings without permanency causes [M.] emotional injury in the form of anxiety and unrest.

The court, balancing Father's desire for reunification with M.'s best interests, concluded that after more than six years of uncertainty within the CINA system, remaining permanently in the stable and loving home provided by L.A., while continuing to build a relationship with Father through visitation, would be in M.'s best interest:

Father is not an unfit parent; the Court acknowledges and appreciates the progress he has made with respect to his role in [M.'s] life. However, his

18

long absence, periods of incarceration, the injury/trauma inflicted on [M.] in October, 2019, the absence of any record resolving the safety risks resting on his unnamed girlfriend's ongoing involvement, and the factors favoring continuation of [M.'s] care by [L.A.], all convince this Court that [M.] cannot be safely reunited with her Father at this time or in the foreseeable future.

Given Dr. Kaufman's testimony and [L.A.'s] demonstrated ability to (1) consistently provide [M.] with a safe and stable environment for healthy development; (2) facilitate a relationship between [M.] and Father, and (3) develop a bond with [M.] akin to that of mother and child – as opposed to the less stable and at times precarious (albeit improved) circumstances in Father's brief care during visits – the Court determines there are exceptional circumstances and compelling reasons which dictate that reunification with Father is not presently in [M.'s] best interest and instead require that custody and guardianship be awarded to [L.A.]. BCDSS Exhibit No. 1 (Custody and Guardianship Packet) is in order and supports the exceptional circumstances and compelling reasons for granting custody and guardianship to maternal cousin [L.A.].

In [L.A.'s] care [M.] can enjoy the far too long delayed permanency and stability that her best interest requires and that she deserves; it is in [M.'s] best interest that custody and guardianship is hereby awarded to [L.A.].

The court emphasized that prolonging CINA proceedings, against M.'s wishes, beyond the six plus years that she had been in the Department's custody, would not be healthy for M. and would not be likely to lead to the reunification sought by Father:

Father's objection to the award of custody and guardianship to [L.A.] is noted. On this record, the Court is convinced that both reunification of [M.] with Father and continuation of this CINA proceeding without reaching permanency would result in significant emotional injury to [M.] for the foreseeable future (Dr. Kaufman). Given their likelihood of causing harm to [M.], neither of these options is in her best interest.

[M.'s] counsel and [M.] support the award of custody and guardianship to [L.A.]. [M.] was consulted on the record. At age 9, [M.] is of the appropriate age and sufficient discernment to designate a preference for the Court to consider. The Court, relying on questions prepared and used by Dr. Kaufman, consulted [M.] on 9/25/2020 on the record and observed an unequivocally positive response to the inquiry about remaining in the care of [L.A.]. While the same inquiry posed with respect to living with Father

19

produced the same verbal response from [M.], it came after a long pause and with some observed reluctance and a turn away from the camera. The manner of [M.'s] responses to these two questions indicate that she wishes to remain permanently with [L.A.] and does not wish to live with her Father. These observations are all consistent with Dr. Kaufman's expert opinions.

Father's fundamental rights to raise his daughter are overcome by the compelling reasons found above and [M.'s] best interest.

\* \* \* \* \*

Father shall continue to have liberal supervised day visitation with [M.] scheduled through [M.'s] guardian. [M.] shall have the ability and right to decline visitation with Father.

Father noted this timely appeal.

## STANDARD OF REVIEW

"There are three distinct but interrelated standards of review applied to a juvenile court's findings in CINA proceedings." *In re J.R.*, 246 Md. App. 707, 730-31 (2020). First,

[w]hen the appellate court scrutinizes factual findings, the clearly erroneous standard of Rule 8-131(c) applies. Second, if it appears that the court erred as to matters of law, further proceedings in the trial court will ordinarily be required unless the error is determined to be harmless. Finally, when the appellate court views the ultimate conclusion of the court founded upon sound legal principles and based upon factual findings that are not clearly erroneous, the court's decision should be disturbed only if there has been a clear abuse of discretion.

*In re Adoption/Guardianship of C.E.*, 464 Md. 26, 47 (2019) (brackets omitted) (quoting

*In re Adoption/Guardianship of Ta'Niya C.*, 417 Md. 90, 100 (2010)).

In particular, we review a juvenile court's "ultimate decision" regarding a CINA

permanency plan for abuse of discretion. *In re Ashley S.*, 431 Md. 678, 704 (2013). "In

this context, an abuse of discretion exists 'where no reasonable person would take the view

20

adopted by the [juvenile] court, or when the court acts without reference to any guiding rules or principles.'" *In re Andre J*., 223 Md. App. 305, 323 (2015) (quoting *In re Yve S.*, 373 Md. 551, 583 (2003)).

Throughout our review, we are mindful that "[b]ecause the overarching consideration in approving a permanency plan is the best interests of the child, we examine the juvenile court's decision to see whether its determination of the child's best interests was 'beyond the fringe' of what is 'minimally acceptable.'" *In re Ashley S.*, 431 Md. at 715 (quoting *In re Yve S.*, 373 Md. at 583-84). In doing so, we recognize that

> it is within the sound discretion of the [juvenile court] to award custody according to the exigencies of each case, and . . . . [s]uch broad discretion is vested in the [juvenile court] because only [the juvenile judge] sees the witnesses and the parties, hears the testimony, and has the opportunity to speak with the child; he is in a far better position than is an appellate court, which has only a cold record before it, to weigh the evidence and determine what disposition will best promote the welfare of the minor.

*In re Yve S.*, 373 Md. at 585-86.

## DISCUSSION

### Grant of Custody and Guardianship

### A. Parties' Contentions

Father avers that the juvenile court erred in granting custody and guardianship of M. to L.A. Father raises three primary contentions. First, he contends that the juvenile court erred in granting custody and guardianship of M. to L.A. and closing the CINA case "during the COVID-19 pandemic." Acknowledging that this CINA matter "continued past the usual two-year timeline[,]" Father argues that "[t]his virus should not be used as a sword to sever the opportunity for reunification to be achieved[,]" because the "pandemic has

21

significantly hindered the opportunity for this father, and other parents similarly positioned, to reach unification" given that "visitation has been completely suspended or moved to remote visits via phone or video – by no fault of the parties."

Second, Father contends that the juvenile court erred in its consideration of factors mandated by Maryland Code (1973, 2020 Repl. Vol.), Courts & Judicial Proceedings Article ("CJP"), section 3-819.2, including future funding by the Department. Father argues that "[i]t appears as though the [juvenile] [c]ourt used the length of time the case has continued as a basis to meet the second step – best interest of the child[,]" but gave "[n]o attention whatsoever" to what should have been "the first step" in its analysis, which he contends requires determination of whether he is "either unfit or that exceptional circumstances exist." In Father's view, "no specifics were stated by the Judge in which to find exceptional circumstances exist to render custody" of M. to L.A., rather than to her natural parent.

Third, Father maintains that the juvenile court abused its discretion in failing to reunify M. with him after he "indicated he was able to have his child in his care[.]" Pointing to the statutory priority favoring reunification with a parent over custody and guardianship to a relative, under CJP § 3-823, Father asserts that M. "can be safely placed in his care immediately[,]" or "[i]n the alternative," maintains that "the case should not be closed before he is given the real opportunity to transition from supervised to unsupervised visits, and from short visits transition to over-night to weekend to weeklong visits to permanent placement with [F]ather."

22

The Department, M., and L.A., appellees, respond that Father's challenges are not supported by the law or the record. The Department contends that the juvenile court considered the appropriate factors and did not otherwise abuse its discretion in ruling that it is in M.'s best interest to order custody and guardianship to L.A. and to end the child's "emotional turmoil from the more-than-six-year CINA proceeding."

M., through counsel, points out that the juvenile court's authority to order custody and guardianship to a relative "was not limited by the COVID-19 Pandemic." In her view, the court correctly "undertook the required considerations" specified in CJP § 8-323(e), including future funding by the Department. She disputes that the statutory scheme required a finding of either unfitness or exceptional circumstances. Nor did the court err or abuse its discretion in balancing "Father's right to custody, against [] M.'s right to achieve permanency," given Father's "lack of progress" toward reunification. Despite Father having received CINA services from the Department for more than six years, M. still did not feel safe with unsupervised visitation.

L.A. concurs with the Department and M. that the juvenile court "acted within its broad discretion in its award of custody and guardianship to [] M.'s caretaker for over six (6) years[.]"

## B. The Family Law Framework

Parents have a fundamental right, guaranteed by the Fourteenth Amendment to the United States Constitution, "to raise [] children free from undue and unwarranted interference on the part of the State[.]" *In re Adoption/Guardianship of Rashawn H. ("Rashawn H.")*, 402 Md. 477, 495 (2007). Consistent with this principle, a parent's

liberty interest in raising a child "cannot be taken away unless clearly justified." *In re Yve S.*, 373 Md. 551, 567 (2003). Yet that "fundamental" right is not absolute because it "must be balanced against the fundamental right and responsibility of the State to protect children, who cannot protect themselves, from abuse and neglect." *In re Adoption/Guardianship of Rashawn H.*, 402 Md. 477, 497 (2007); *see also in re Mark M.*, 365 Md. 687, 705-06 (2001) ("That which will best promote the child's welfare becomes particularly consequential where the interests of a child are in jeopardy[.]").

Maryland courts harmonize parents' fundamental rights to raise their own children with the children's best-interest standard through application of the "substantive presumption [ ] of law and fact [ ] that it is in the best interest of the children to remain in the care and custody of their parents." *Rashawn H.*, 402 Md. at 495. The State can rebut this presumption by "showing either that the parent is 'unfit' or that 'exceptional circumstances' exist which would" render custody to the parents contrary to the child's best interests. *Id.* at 495.

The General Assembly has established a statutory framework for the State's exercise of its authority to safeguard a child in need of its assistance. Under CINA provisions in Title 9 of the Maryland Code (1984, 2019 Repl. Vol.), Family Law Article ("FL"), and Subtitle 8 of the Courts & Judicial Proceedings Article, "[w]hen it is determined that a parent cannot adequately care for a child, and efforts to reunify the parent and child have failed, the State may intercede and petition for guardianship of the child pursuant to its *parens patriae* authority." *In re Adoption/Guardianship of C.E.*, 464 Md. 26, 48 (2019).

24

"The purpose of CINA proceedings is 'to protect children and promote their best interests.'" *In re Priscilla B.*, 214 Md. App. 600, 622 (2013) (quoting *In re Rachel T.*, 77 Md. App. 20, 28 (1988)); *see* CJP § 3-802(a).  A juvenile court may find that a child is in need of assistance upon a showing, by a preponderance of the evidence, that the child "requires court intervention because: (1) [t]he child has been abused, has been neglected, has a developmental disability, or has a mental disorder; and (2) [t]he child's parents, guardian, or custodian are unable or unwilling to give proper care and attention to the child and the child's needs."  CJP § 3-801(f); CJP § 3-817(c).

"In cases where a child in need of assistance has been placed outside of the family home, the juvenile court must determine a permanency plan consistent with the child's best interests."  *In re Andre J.*, 223 Md. App. 305, 320 (2015) (citing CJP § 3-823(b)).  When choosing a permanency plan, "the court shall consider the factors specified in § 5-525(f)(1) of the Family Law Article."  CJP § 3-823(e)(2).  These statutory factors are:

> (i) the child's ability to be safe and healthy in the home of the child's parent;
>
> (ii) the child's attachment and emotional ties to the child's natural parents and siblings;
>
> (iii) the child's emotional attachment to the child's current caregiver and the caregiver's family;
>
> (iv) the length of time the child has resided with the current caregiver;
>
> (v) the potential emotional, developmental, and educational harm to the child if moved from the child's current placement; and
>
> (vi) the potential harm to the child by remaining in State custody for an excessive period of time.

FL § 5-525(f)(1).

25

This statutory scheme is designed to "conserve and strengthen the child's family ties and to separate a child from the child's parents only when necessary for the child's welfare." CJP § 3-802(a)(3). "The statute presumes that, unless there are compelling circumstances to the contrary, the plan should be to work toward reunification, as it is presumed that it is in the best interest of a child to be returned to his or her natural parent." *In re Yve S.*, 373 Md. at 582.

Accordingly, the juvenile court, when determining a permanency plan, must follow a prescribed hierarchy of placement options that prioritize "[r]eunification with the parent or guardian" over "[p]lacement with a relative for[ ] . . . [c]ustody and guardianship under § 3-819.2 of this subtitle." CJP § 3-823(e)(1)(i)(1)-(2). Before granting custody and guardianship to a non-parent, moreover, the court must consider:

> (i) Any assurance by the local department that it will provide funds for necessary support and maintenance for the child;
>
> (ii) All factors necessary to determine the best interests of the child; and
>
> (iii) A report by a local department or a licensed child placement agency, completed in compliance with regulations adopted by the Department of Human Services, on the suitability of the individual to be the guardian of the child.

CJP § 3-819.2(f)(1).

"Once set initially, the goal of the permanency plan is re-visited periodically at hearings to determine progress and whether, [because of] historical and contemporary circumstances, that goal should be changed." *In re Andre J.*, 223 Md. App. at 322 (quoting *In re Yve S.*, 373 Md. at 582); *see* CJP § 3-823(h)(1)-(2). A juvenile court is required to "[c]hange the permanency plan if a change . . . would be in the child's best interest." CJP

§ 3-823(h)(2)(vi). Consequently, "if there are weighty circumstances indicating that reunification with the parent is not in the child's best interest, the court should modify the permanency plan to a more appropriate arrangement." *In re Adoption of Cadence B.*, 417 Md. 146, 157 (2010).

In this case, the General Assembly's clearly established policy and procedural push toward permanency has special relevance. The CINA statutory scheme expressly states that "[e]very reasonable effort shall be made to effectuate a permanent placement for the child within 24 months after the date of initial placement." CJP § 3-823(h)(4).

### C. Analysis

We discern no error or abuse of discretion in the juvenile court's decision to grant custody and guardianship of M. to L.A. Consistent with its statutory obligations, the juvenile court focused its determination on M.'s best interests. The court's detailed factual findings reflect appropriate consideration of "[a]ll factors necessary to determine the best interests of the child," as required by CJP § 3-819.2(f)(1)(ii), and FL § 5-525(f)(1). Concerning M.'s "ability to be safe and healthy in the home of" Father, the court did not err in determining that M. "cannot safely be reunified with her Father at this time or in the foreseeable future." FL § 5-525(f)(1)(i). While acknowledging Father's progress, Father's "long absence, periods of incarceration, the injury/trauma inflicted on [M.] in October, 2019, [and] the absence of any record resolving the safety risks resting on his unnamed girlfriend's ongoing involvement" forestalled the ability to return to Father without serious risk to M.'s health and safety.

27

The court considered M.'s "emotional attachment to" L.A., FL § 5-525(f)(1)(iii); "the length of time" that M. had been living with L.A., FL § 5-525(f)(1)(iv); and "the potential emotional, developmental, and education[al] harm to" M. if she were removed from L.A.'s care, weighing all of these factors heavily in favor of continuing M.'s *lifelong* care by L.A. The court acknowledged Father's consistent desire for and efforts at reunification, but concluded these were counterbalanced by ongoing concerns presented by his repeated incarcerations, uncertain housing, and intermittent employment, all of which undermined M.'s "ability to be safe and healthy in" Father's home. The court found that Father's desire for reunification and M.'s "emotional attachment" to Father, FL § 5-525(f)(1)(ii); was outweighed by M.'s strong and consistently expressed "desire to remain permanently" with L.A., given the existing and "potential harm to" M. from continuing the CINA case "for an excessive period of time."

Concerning the factors delineated under CJP § 3-819.2(f)(1), the juvenile court received into evidence the Department's guardianship packet and reviewed "a report by BCDSS . . . in compliance with applicable regulation, on the suitability of the person to be the guardian of the child." The court further detailed in its written order that the Department "has not provided assurances that it will provide funds for necessary support and maintenance of the child."

Father does not directly challenge each aspect of the juvenile court's order but narrows his challenge to three primary errors. We turn to address Father's pandemic, procedural, and parental priority challenges in turn.

## 1. Pandemic Challenge

In Father's view, "[i]t was a gallimaufry that contributed to the" timeline of this CINA case extending "past the usual two-year" period, "much of which was out of [his] control, and included issues related to the COVID-19 pandemic." Although we agree that there was a medley of factors that contributed to prevent a prompt placement for M., we conclude that the record strongly refutes Father's claims that "much of" those were either beyond his control or related to the pandemic.

As M. points out, Father did not raise this issue at the September 2020 hearing. Yet our task is to review the totality of the circumstances considered by the juvenile court, which include the impact of the pandemic on reunification efforts. Consequently, we address Father's contentions in that context.

As detailed in our timeline review of the record, Father's actions either created or contributed to the series of reunification obstacles that prolonged CINA proceedings past the statutory 24-month guideline. Father's incarcerations stemmed from multiple arrests, criminal charges, and convictions, beginning before the Department initiated shelter care and CINA proceedings in June 2014. These continued for nearly two years—the period that the General Assembly established as a benchmark for resolving permanency for the child. *See* CJP § 3-823(h)(4) (noting reasonable effort should be made to establish permanent placement of child within 24 months).

Unfortunately, Father's 2016 conviction and incarceration for possession of a controlled dangerous substance interrupted visitations and set back his relationship with M. by delaying progress toward reunification. When he resolved that criminal matter,

29

Father's housing and employment were not stable enough to resume unsupervised visitation until the following year.

By the summer and fall of 2019, when Father had progressed to having regular and frequent unsupervised visits, he was not able to keep M. safe. From employing discipline that heightened her fears and anxiety, to leaving her alone in the care of his girlfriend without notifying L.A. or the Department, Father's actions impeded progress toward reunification. The disciplinary incident during the weekend visit before M. expressed suicidal ideation caused another significant setback to M.'s relationship with Father, resulting in temporary suspension of all visitation and a new condition allowing M. to decline supervised visits. Given the child's situational depression, which was exacerbated by her unfulfilled desire to permanently live with L.A., the juvenile court did not err or abuse its discretion in determining that, given the lack of success in reuniting M. with Father for more than six years, reunification was not likely in the foreseeable future.

To be sure, the pandemic created some unexpected obstacles to visitation and reunification that were beyond Father's control. But the record does not support his contention that "much of" the four-year period after the 24-month benchmark for resolving CINA proceedings was "related to the pandemic."

Indeed, progress toward reunification undisputedly halted long before COVID-19 curtailed contact between M. and Father. It was in October 2019, more than five months

30

before pandemic-related restrictions were implemented in March 2020,[9] that M. suffered a mental health emergency arising from her unsupervised visitations with Father. That mental health crisis, not the pandemic, caused all visitation to be suspended temporarily.

Moreover, the record shows that pandemic-related restrictions did not prevent all visitation. By December 2019, Father and M. had begun supervised family therapy in an effort to rebuild their relationship. In February 2020, the court approved supervised visitation, subject to M.'s right to decline on a visit by visit basis. Although the pandemic later limited in-person visits, Father did have telephone visits as well as two supervised in-person visits with M. before the permanency plan hearing in late September 2020.

Based on this record, the juvenile court did not err or abuse its discretion in failing to treat pandemic-related restrictions on visitation as grounds for extending CINA proceedings beyond the six years that M. was in the Department's custody.

## 2. Procedural Challenges

Father challenges the best interests predicate for the juvenile court's order granting custody and guardianship to L.A., arguing that the court erred in circumventing prerequisites that the court first must (a) consider future funding by the Department and (b) make a finding that there are exceptional circumstances warranting custody and

---

[9] *See* The Court of Appeals of Maryland, Administrative Order on Statewide Closing of the Courts to the Public Due to the COVID-19 Emergency (Mar. 13, 2020) (closing "courts in the Maryland Judiciary . . . to the public on an emergency basis, effective March 16, 2020" but continuing Judiciary operations "to the extent practicable").

guardianship to a relative rather than a natural parent whom the court determined was not unfit. We conclude that Father misstates both the record and the law.

As a threshold matter, the juvenile court did expressly find "exceptional circumstances" warranting custody and guardianship to L.A. Specifically, the court determined in its written order that, although "Father is not an unfit parent[,]"

> [t]here *are exceptional circumstances and compelling reasons* which dictate that reunification with Father is not presently in [M.'s] best interest and instead require that custody and guardianship be awarded to [L.A.]. BCDSS Exhibit No. 1 (Custody and Guardianship Packet) is in order and supports the exceptional circumstances and compelling reasons for granting custody and guardianship to maternal cousin [L.A.].

(Emphasis added). The Custody and Guardianship Report sets forth the history of M.'s CINA case and makes the assessment that M.'s permanent placement with L.A. would be in her best interests.

In support of this determination, the juvenile court made factual findings bearing on the factors articulated by the Court of Appeals in *Ross v. Hoffman*, 280 Md. 172, 191 (1977). *See also Burak v. Burak*, 455 Md. 564, 938-39 (2017) (referencing *Hoffman* factors in custody dispute between parent and third-party). These factors include:

> (1) the length of time the child has been away from the biological parent;
> (2) the age of the child when care was assumed by the third-party;
> (3) the possible emotional effect on the child of a change of custody;
> (4) the period of time which elapsed before the parent sought to reclaim the child;
> (5) the nature and strength of the ties between the child and the third-party custodian;
> (6) the intensity and genuineness of the parent's desire to have the child; and
> (7) the stability and certainty as to the child's future in the custody of the parent.

*Id.* at 938-39.

In reference to the first two factors, the court found that M. "has essentially lived her life in . . . [L.A.]'s home . . . since she was six months old." Concerning the "emotional effect on the child of a change of custody" and the "nature and strength" of M.'s ties with L.A., factors three and five, the court determined that M. "has long considered and referred to [L.A.] as her 'mother'" and "would suffer serious emotional impact if she were removed from the care of the only fictive-kin 'mother' she has ever known." Considering factors four and six, the court recognized that Father desired to be reunited with M. and "acknowledge[d] and appreciate[d] the progress he has made," but found that Father's absence prevented M. from "enjoy[ing] the far too long delayed permanency and stability that her best interest requires and that she deserves." While M. is "slowly opening to greater contact with her Father," work remained to "overcome [M.]'s deep fears and anxiety resulting from the 10/7/2019 event and the years of out of home placement as a CINA." The court credited L.A. for supporting Father and M.'s relationship and "expanding contact between [M.] and Father as therapy progresses."

Finally, regarding the seventh factor, the juvenile court did not agree that M. could safely return immediately to Father's care. In contrast, the court determined that M. "convincingly wishe[d] to remain permanently" in L.A.'s care; that a close bond and attachment had developed between M., L.A., and her large extended family; and that M.'s "educational, medical and avocation interests (e.g. dance) are well provided for by" L.A. *See id.* at 566 n.59 (noting that, in addition to the *Hoffman* factors, factors such as "the stability of the child's current home environment, whether there is an ongoing family unit, and the child's physical, mental, and emotional needs" are relevant to an "exceptional

33

circumstances" analysis). Consequently, Father's contention that the juvenile court failed to find exceptional circumstances is factually incorrect.[10]

[10] Father's contention that the juvenile court was required to find exceptional circumstances before considering M.'s best interests lacks legal merit. Relying on *McDermott v. Dougherty*, 385 Md. 320 (2005), and *B.G. v. M.R.*, 165 Md. App. 532 (2005), Father argues that "custody to a third party is to be a two-step process" that protects the parent's "fundamental constitutional right" by requiring "proof that both parents are unfit or extraordinary circumstances render custody to a parent detrimental to the child." In Father's view, the juvenile court erred in citing "the length of time the case has continued as a basis to meet the second step – best interest of the child[,]" but skipped "the first step – that of finding [Father] either unfit or that exceptional circumstances exist."

Father misconstrues the CINA framework. Under this statutory scheme, the juvenile court's threshold finding that a child is in need of assistance as a result of parental abuse or neglect supplies the statutory predicate for considering the child's best interests. Specifically, the predicate findings for a CINA proceeding—that a child was neglected and that the child's parents "are unable or unwilling to give proper care and attention to the child and the child's needs[,]" CJP § 3-801(f)(2)—establish both grounds for judicial intervention and authority to engage in permanency planning based on an assessment of the child's best interests.

As discussed, the bedrock of CINA permanency planning is the "best interests of the child" standard. *See In re Andre J.*, 223 Md. App. at 321 (quoting *In re Ashley S.*, 431 Md. at 686). Although such planning begins with the presumption that reunification with parents is in a child's best interests, *see In re Yve S.*, 373 Md. at 582, that presumption may be rebutted when, as in this case, the court determines, after considering the statutory factors in FL § 5-525(f)(1), that "weighty circumstances" dictate that a different plan is in the child's best interests. *In re Cadence B.*, 417 Md. at 157.

We recognize that in both termination of parental rights cases and third-party custody cases, a determination of "unfitness" or "exceptional circumstances" is a threshold that must be crossed before the court may consider limiting a parent's custodial or parental rights on the ground that doing so would be in the child's best interests. *See In re Adoption/Guardianship of H.W.*, 460 Md. 201, 216-17 (2018) (termination of parental rights). However, this case does not involve either termination of parental rights or adoption. At no point has the Department or L.A. sought termination of Father's parental rights or suggested adoption. To the contrary, Father has maintained a parental relationship with M. through visitation and may continue to do so under the order he is now challenging. *Cf. Caya B.*, 153 Md. App. at 78 ("If the permanency plan calls for custody and guardianship by a relative but does not contemplate adoption, the court may issue a decree of guardianship to the relative and may then close the case. Parental rights are not terminated in such a situation." (citing CJP § 3-823(h)(iii)(1)).

34

Nor does the record support Father's claim that the Department failed to consider future funding for the guardianship, as required by CJP § 3-819.2(f)(1). To the contrary, the Department's Custody and Guardianship Report contains information about L.A.'s finances and copies of a Guardianship Assistance Agreement indicating that "[t]he child is eligible for State Subsidized Legal Guardianship Assistance" at the "[d]aily rate of $29.16." In addition, a disclosure and application for L.A. includes acknowledgements that she "is approved for the Guardianship Assistance Program" but "has an independent means of financial support for [herself] and [her] family other than the guardianship assistance." Because this record shows "'actual consideration of the necessary legal considerations[,]'" the court was not required to make additional on-the-record findings regarding future funding. *Cf. In re Adoption/ Guardianship of Jasmine D.*, 217 Md. App. 718, 738 (2014) (holding that the juvenile court did not err in failing to "explicitly state that a termination of [the mother's] parental rights would be in [the child's] best interest in either its oral opinion or written order" because the court was "'not required to recite the magic words of a legal test'" in a manner that elevated "'form over substance'" where "'actual consideration of the necessary legal considerations are apparent in the record'") (quoting *S. Easton Neighborhood Ass'n v. Town of Easton*, 387 Md. 468, 495 (2005)).

Therefore, for the foregoing reasons, we hold that the juvenile court did not err or abuse its discretion in a manner that violated the CINA statutory framework.

### 3. Parental Priority Challenge

Father challenges the ultimate decision to order custody and guardianship to L.A. and close the CINA case, contending that the juvenile court abused its discretion in failing

to implement the statutory priority favoring parent reunification over custody and guardianship to a relative. In Father's view, the court should have treated his assertion that "he was able to have his child in his care" as grounds to either immediately return M. to his custody or to continue CINA proceedings to afford him "the real opportunity to transition from supervised to unsupervised visits, and from short visits transition to over-night to weekend to weeklong visits to permanent placement with [F]ather."

We conclude that the juvenile court did not abuse its discretion in deciding that, after more than six years, Father had yet to make enough progress that reunification was foreseeable and that prolonging the lack of permanency would be detrimental to M. Father enjoyed the benefits of a reunification plan throughout these CINA proceedings. He received services from the Department, which he agreed amounted to reasonable efforts to implement that reunification plan. During these six years, Father had "the real opportunity" for unsupervised and overnight visitations, which were necessary mileposts on the road toward reunification. Yet Father's actions disrupted progress toward reunification, creating obstacles to visitation and setbacks to his relationship with M.

As detailed in our review of the CINA record, for much of 2014, 2015, and 2016, Father's incarcerations and his conviction for possession of a controlled dangerous substance thwarted unsupervised visitation. It was not until December 2017—30 months after his then-three-year old daughter had been placed into shelter care—that Father met the service agreement and housing requirements necessary for unsupervised visits with M. Thereafter, in the summer and fall of 2019, a series of incidents during unsupervised visits

36

led to M.'s situational depression and suicidal ideation, which in turn caused another significant setback to their relationship and stalled progress toward reunification.

The juvenile court made clear that Father is not an unfit parent, that he sincerely desired to reunite with M., and that he made efforts and progress toward that goal. But the court also concluded that his parental priority and preferences were outweighed by the overwhelming evidence that for over six years he was unable to parent M. consistently or safely, and that remaining with L.A., while continuing visits with Father as she has throughout her life, was in the best interests of M.

Father culls from the record a different account of what happened and why, despite the Department's reasonable services, reunification did not occur during the six years M. was a CINA. As set forth in our detailed review of the record, there is ample evidence to support the juvenile court's findings that Father bears responsibility for his own actions over the six years of CINA proceedings, which impeded reunification.

Meanwhile, the evidence also supports the juvenile court's findings that M. has thrived in the care of L.A., who has been a consistent and essential caregiver throughout M.'s life. M. considers L.A. her mother, and they have a strong parent-child bond. M. was an A and B student in fourth grade and achieved perfect attendance in school "for a couple of years." L.A. helps her with nightly homework. M. especially enjoys dance classes, for which L.A. pays $225/month. L.A., who has worked for the same company for 16 years, receives no financial support from Father. M. has her own room in L.A.'s house. L.A. spends more than $600 monthly for M.'s food, clothes, dance, school, and other needs.

Notably, the record demonstrates that L.A. supports Father's efforts to have a strong and good relationship with M. Dr. Kaufman commended L.A. for encouraging M.'s relationship with Father. In an effort to help Father become an "integral part of []M.'s life[,]" L.A. bought M. a cell phone to communicate with Father. She participated in three mediations with Father, to improve their communication regarding M., discuss visitation scheduling, and address the impact of L.A. having custody and guardianship. She has committed to supporting visitation after the CINA case is closed.

At the September 25 hearing, M. told the court that she would feel "sad" if she was not allowed to live with L.A. Dr. Kaufman testified that M. wanted "to continue in family therapy with her father" but "only want[ed] supervised visits."

The juvenile court also credited Dr. Kaufman's expert opinion that delaying permanency by declining to order custody and guardianship to L.A. would be harmful to M. Dr. Kaufman testified that M.'s "first preference, her strong preference[,]" was to remain with L.A., who has been her day-to-day and psychological parent since infancy. Continuing the CINA proceedings in an effort to work toward reunification with Father was causing M. "significant stress." "[A]nother trial, to revisit the question of who should have custody of [M.] is not in her best interest." Moreover, Dr. Kaufman testified that M. did not "need[] to be under the supervision of the Department" because "she's been [a ward of] the State for six years despite having a very, loving caring family," so "it's time for permanence to be established for her."

Based on this record, we hold that the juvenile court did not err or abuse its discretion in granting custody and guardianship to L.A. and "liberal supervised day

visitation" to Father, and in closing the CINA case. The detailed findings in the court's written order satisfy both the procedural and the substantive requirements under the CINA statutory framework. Most importantly, the court articulated a reasonable factual and statutory basis for awarding custody and guardianship to L.A.

Our CINA system is designed to be temporary because "a child should have permanency in his or her life." *In re Adoption/Guardianship of Jayden G.,* 433 Md. 50, 84 (2013) (citing *In re Adoption/Guardianship No. 10941*, 335 Md. 99, 106 (1994)). As reflected in the statutory factors that the court must consider, permanency planning requires examination of "the child's actual lived experience in the world" by considering "the child's point of view, valuing the child's current emotional attachments, recognizing that time has an effect on the child, and recognizing that removing a child from a placement where the child has formed emotional attachments can cause 'potential emotional, developmental, and educational harm to the child[.]'" Richard A. Perry, *Relative Preference, Emotional Attachments, and the Best Interest of the Child in Need of Assistance*, 50 U. Balt. L.F. 83, 106-07 (2020).

"The valid premise is that it is in the child's best interest to be placed in a permanent home and to spend as little time as possible in" the custody of the Department. *See In re Jayden G.*, 433 Md. at 84. That "means having 'constant, loving parents,' knowing 'that their homes will always be their home; that their brothers and sisters will always be near; and that their neighborhoods and schools are familiar places.'" *Id*. at 82-83.

M. has such a home with L.A. In the absence of her birth mother, M. has been fortunate to grow up with L.A. as her *de facto* and psychological mother. M. has

39

consistently expressed a strong desire to remain permanently in L.A.'s custody and care. M. has been harmed by the uncertainty of this prolonged CINA proceeding, which has extended far beyond the 24-month benchmark established by the General Assembly. We agree with the juvenile court that she "requires" and "deserves" permanency.

Yet that does not mean M. has no interest in having a relationship with Father. Despite obstacles and setbacks, both M. and Father have returned again and again to rebuild their relationship through visitation. As the court recognized, L.A. supports and facilitates their relationship. Although the "liberal supervised day visitation" ordered by the court may not be Father's choice, we cannot say the court abused its discretion in determining that is what is in M.'s best interest. We therefore affirm the judgment.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED; COSTS TO BE PAID BY APPELLANT.**

The correction notice(s) for this opinion(s) can be found here:

https://mdcourts.gov/sites/default/files/import/appellate/correctionnotices/cosa/0807s20cn.pdf